**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **DOROTHY HEGWOOD, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:04-CV-2674-BH (G)** |
| | § | |
| **ROSS STORES, INC.,** | § | |
| | § | |
| **Defendant.** | § | **Consent Case** |

<u>**MEMORANDUM OPINION**</u>

Pursuant to the District Court's *Order of Transfer*, filed February 22, 2005, and the consent of the parties, this matter was transferred to the undersigned United States Magistrate Judge for the conduct of all further proceedings and the entry of judgment in accordance with 28 U.S.C. § 636(c). On February 21 through 23, 2007, the Court conducted a bench trial regarding a contractual indemnity and defense dispute between Defendant Ross Stores, Inc. ("Ross") and Defendant Heavy Metal, Inc. ("Heavy Metal").[1] After consideration of the testimony and evidence presented during the trial, the parties' post-trial proposed findings of fact and conclusions of law, the post-trial briefing,[2] the arguments of counsel, and the relevant authorities, the Court finds and concludes as set forth below.

**I. BACKGROUND**

---

[1]"Tr." designates the three-volume transcript of the February 21 to 23, 2007 proceedings before the Court, which was filed on March 7, 2007.

[2]Ross objects to the length of Heavy Metal's final argument and brief in support on the grounds that at 41 pages, it violates Local Rule 7.2(c)'s requirement that briefs not exceed 25 pages. Because proposed findings of fact and conclusions of law are not briefs or motions, Local Rule 7.2 does not apply. Furthermore, at the conclusion of the bench trial, the Court did not specify a page limit for the parties' proposed findings of fact and conclusions of law and briefs in support. (*See* Tr. Vol. 3 at 182-86.) Ross's objection is therefore **OVERRULED**, and the motion to strike is **DENIED**.

On September 17, 2004, Plaintiff Dorothy Hegwood sustained injuries when, while shopping at one of the stores owned by Defendant Ross, she sat in a folding metal chair that collapsed (hereinafter, the "Chair"). Ross had purchased the Chair from Defendant Heavy Metal, who had imported it from China. On November 15, 2004, Dorothy and Harry Hegwood ("Plaintiffs") filed suit in the 298th Judicial District Court of Dallas County, Texas, against Ross. The case was removed to the District Court for the Northern District of Texas on the basis of diversity jurisdiction on December 17, 2004. On June 7, 2005, Ross filed a third party complaint against Heavy Metal for indemnity. On June 27, 2006, with leave of the Court, Ross formally amended its complaint against Heavy Metal to allege contractual indemnity and defense based on the parties' purchase order agreement for the Chair. The Court denied Ross's motion for partial summary judgment for its claims against Heavy Metal for contractual indemnity and defense on November 28, 2006, on the grounds that genuine issues of material fact remained for trial.

At the time of the trial of this case in February 2007, the only claims pending against Ross were defective design, defective manufacture, and negligent failure to inspect the chair prior to placing it for sale on the sales floor. Claims against Heavy Metal at the time of trial consisted of defective design, defective manufacture, and negligent failure to inspect the Chair and manufacturing facilities in China. Prior to jury selection on February 21, 2007, Ross and Heavy Metal jointly entered into a settlement with Plaintiffs on all claims against them. Ross and Heavy Metal tried the indemnity and defense claims to the Court from February 21 to 23, 2007.

## II.  FINDINGS OF FACT

1.      Ross, a Delaware corporation whose principal place of business is California, has approximately 800 retail stores in the United States.  (Tr. Vol. 3 at 121.)

2.      Heavy Metal, a California corporation whose principal place of business is California, is a distributor of products manufactured in foreign countries, including China.  (Tr. Vol. 1 at 5-6.)

3.      Ross does not manufacture products, but purchases and resells products manufactured or distributed by other companies, including Heavy Metal.  (Tr. Vol. 3 at 124.)

4.      Ross has been a customer of Heavy Metal for approximately seven years.  (Tr. Vol. 1 at 9; Tr. Vol. 3 at 124.)

5.      Heavy Metal displays samples of its merchandise in its showroom and at trade shows for retailers such as Ross to purchase.  (Tr. Vol. 1 at 9-10, 48-49.)

6.      Angela Mevo, a buyer out of Ross's New York office, inspected a sample of Heavy Metal's Aztec Leather Iron Table Set at a trade show sometime in 2003 and found the sample to be of high-quality and structurally sound.  (Tr. Vol. 3 at 149.)

7.      The Aztec Leather Iron Table Set chair consists of a metal frame connected to a sliding metal crossbar with welding material at two welds on the leg tubes, one on the right and one on the left.  The crossbar is restrained by a metal bracket beneath the seat.  (Ross Ex. 1; Tr. Vol. 3 at 11.)

8.      The metal crossbar supports the Aztec Leather Iron Table Set chair.  (Tr. Vol. 3 at 11.)

9.      When the Aztec Leather Iron Table Set chair is folded, the crossbar is at the rear end of the seat; when unfolded, the crossbar is at the front of the seat and stops when it hits the metal bracket.  (Ross Ex. 1; Tr. Vol. 3 at 11.)

10.     The design of the Aztec Leather Iron Table Set chair has a load bearing capacity of approximately 320 pounds.  (Tr. Vol. 3 at 23-24, 60).

11.     Angela Mevo placed an order with Heavy Metal for 300 Aztec Leather Iron Table Sets on September 15, 2003; each set consisted of one table and four metal folding chairs.  (Tr. Vol. 1 at 16-17; Ross Ex. 2.)

12.     Ross did not specify any changes to the design or manufacturing process of the Aztec Leather Iron Table Sets or request any specific weight testing or other quality control procedures be implemented, although it could have requested certain specifications.  (Tr. Vol. 1 at 49-50; Tr. Vol. 3 at 150-51.)

13. Ross and Heavy Metal executed a purchase order contract for the Aztec Leather Iron Table Sets that contained certain terms and conditions, including warranty, indemnity, and defense provisions. (Tr. Vol. 1 at 14, 19-26; Tr. Vol. 3 at 128-133; Ross Ex. 2.)

14. Ross drafted the terms and conditions and issued the purchase order. (Tr. Vol. 3 at 128-29.)

15. Heavy Metal had knowledge of the purchase order terms and conditions prior to entering into the contract with Ross. (Tr. Vol. 1 at 24-25.)

16. Paragraph 1 of the purchase order contract contains the following provision:

   1. ALL MERCHANDISE IS SAFE AND FIT FOR THE USE FOR WHICH IT WAS MANUFACTURED AND THAT IT IS FREE FROM DEFECT AND OTHER MATERIALS WHICH MAY BE INJURIOUS TO PERSONS OR PROPERTY.

   (Ross Ex. 2.)

17. Paragraph 21 of purchase order contract contains the following indemnity and defense provisions:

   DISPUTE RESOLUTION

   21. AT ITS OWN EXPENSE, SELLER WILL DEFEND, INDEMNIFY AND HOLD HARMLESS PURCHASER (INCLUDING PAYMENT OF ANY ROYALTIES, LICENSE FEES, INVESTIGATION EXPENSES, RECALL EXPENSES, DIRECT, CONSEQUENTIAL AND INCIDENTAL DAMAGES, AND ATTORNEY'S FEES INCURRED BY PURCHASER OR FOR WHICH PURCHASER BECOMES LIABLE) FROM ANY CLAIM, ARISING IN CONNECTION WITH THE MERCHANDISE OR IN CONNECTION WITH THIS PURCHASE ORDER AND TRANSACTION WHETHER OR NOT PURCHASER OR SELLER HAS A VALID DEFENSE TO THE CLAIM, AND REGARDLESS OF WHETHER THE CLAIM IS TRUE OR VALID. A "CLAIM" INCLUDES BUT SHALL NOT BE LIMITED TO ANY DEMAND, LAWSUIT, ARBITRATION, GOVERNMENTAL ACTION (INCLUDING ADMINISTRATIVE PROCEEDING), OR ANY OTHER LEGAL PROCEEDING (INCLUDING A THREAT OF ANY OF THE FOREGOING).

   (Ross Ex. 2.)

18. The indemnity provision of the purchase order contract is silent on the issue of negligence. (*See* Ross. Ex. 2, ¶21.)

19. Heavy Metal's understanding of Paragraph 21 at the time it entered into the agreement was that it would be responsible for defective products but that it would not be responsible for

any problems caused by Ross or Ross's customers.  (Tr. Vol. 1 at 24-25.)

20.    Ross's understanding of Paragraph 21 at the time it entered into the agreement was that Heavy Metal would stand behind its products and was responsible for the structural safety of its products.  (Tr. Vol. 3 at 134-35, 145.)

21.    Paragraph 24 of the purchase order contract contains the following provision:

        24.  THIS PURCHASE ORDER WILL BE CONSTRUED UNDER CALIFORNIA LAW.

        (Ross Ex. 2.)

22.    At no time did Heavy Metal ever object to or attempt to negotiate or eliminate the warranty or indemnity provisions of the purchase order; if it had, the purchase order would have been void.  (Tr. Vol. 1 at 25-26; Tr. Vol. 3 at 135-36, 145-46.)

23.    Once the purchase order was finalized, Heavy Metal utilized a Chinese agent, Permaisuri, to import the Aztec Leather Iron Table Sets from China.  (Tr. Vol. 1 at 17-18, 26-27; Tham Depo. at 33-35.)

24.    Heavy Metal, through Permaisuri, placed an order for the Aztec Leather Iron Table Sets from the manufacturer, Fuzhou Mei Juan Art & Craft Co., Ltd. ("Fuzhou Mei Juan"), a Chinese company.  (Tr. Vol. 1 at 28-30; Tham Depo. at 39-40, 43.)

25.    The Chair manufactured by Fuzhou Mei Juan was of the same design as the sample Aztec Leather Iron Table Set chair inspected and ordered by Angela Mevo.  (Tr. Vol. 1 at 9-10, 48-49; Tr. Vol. 3 at 149.)

26.    Heavy Metal relies on Permaisuri to implement its four-step quality control program for merchandise ordered by customers.  (Tr. Vol. 1 at 31-34.)

27.    Ross does not do safety screening or safety evaluation of products it imports through importers.  (Tr. Vol. 3 at 142, 159-60.)

28.    Permaisuri inspected and performed random quality control checks on behalf of Heavy Metal on approximately 30% of the Aztec Leather Iron Table Sets ordered by Ross.  (Tr. Vol. 1 at 34-35; Tham Depo. at 53-54.)

29.    One of the Aztec Leather Iron Table Sets ordered and received by Ross included the Chair.  (Tr. Vol. 1 at 16-17; Ross Ex. 2.)

30.    There is no evidence that the Chair was among the 30% selected by Permaisuri for inspection and quality control.

31. Quality issues are normally detected within the first 5 to 10% of products inspected. (Tham Depo. at 53-55.)

32. Permaisuri's inspection and quality control process included an examination of the joints and welds of the product. (Tr. Vol. 1 at 33-34; Tham Depo. at 52-54.)

33. Permaisuri performed a 300 pound static weight test on the order containing the Chair as part of its quality control and inspection process. The static weight test consisted of lowering a sandbag on a beam to identify any structural deformity. (Tr. Vol. 1, at 34-35; Tham Depo. at 66-68.)

34. If an order fails Permaisuri's inspection process, Heavy Metal rejects the goods. (Tr. Vol. 1 at 36-37.)

35. The order which included the Chair passed Permaisuri's inspection process. (Tham Depo. at 64.)

36. At the conclusion of the inspection process, the order containing the Chair was packaged at Fuzhou Mei Juan and shipped from Heavy Metal's China shipping office to the Port of Long Beach, California, in January 2004. (Tr. Vol. 1 at 36-37, 39; Tham Depo. at 52, 63-64; Ross Ex. 46.)

37. Heavy Metal did not open the box; the Chair arrived at the Ross distribution center in Newark, California, in early February 2004, in the same box in which it was shipped from Fuzhou Mei Juan. (Tr. Vol. 1 at 36-38; Tham Depo. at 63-64; Ross Ex. 46.)

38. The Ross distribution center in Newark, California, completed processing the order containing the Chair on February 27, 2004. (*See* Ross Ex. 47.)

39. The Ross distribution center listed the retail price of the Chair as $24.99. (*See* Ross Ex. 47.)

40. The box containing the Chair arrived at the Ross Preston Center store in Dallas, Texas, sometime between March and September 2004. (*See* Ross Ex. 47; Tr. Vol. 2 at 144-49.)

41. When the Chair arrived at the Preston Center store, it was unpacked and unfolded by Ross employees in the stockroom in the back of the store. (Tr. Vol. 1 at 96-98.)

42. While unpacking the chairs of the Aztec Leather Iron Table Set, Ross employees lifted the chairs out of the box with the underside of the seat facing the employee. Ross employees then pressed the seats down while the chairs were on the floor to ensure that they locked properly and did not wobble. (Tr. Vol. 1 at 98-99, 152-54.)

43. While unpacking the chairs of the Aztec Leather Iron Table Set, Ross employees performed a cursory visual inspection to look for rough or broken edges; they did not perform a careful

inspection of welds. (Tr. Vol. 1 at 98-99, 152-54.)

44.   None of the Ross employees at the Preston Center store were qualified to evaluate the welds or the weight-bearing capacity of the chairs of the Aztec Leather Iron Table Set. (Tr. Vol. 1 at 122-23.)

45.   None of the Ross employees noticed a bent crossbar beneath the seat of any of the Aztec Leather Iron Table Set chairs during the unpacking process. (Tr. Vol. 1 at 152-53.)

46.   The Ross employees at the Preston Center store did not detect any damage or defects in the chairs of the Aztec Leather Iron Table Set prior to placing them out on the sales floor. (Tr. Vol. 1 at 145.)

47.   If the Chair had arrived at Preston Center in a damaged condition, Ross could have returned the Chair and received a refund or replacement from Heavy Metal. (Tr. Vol. 1 at 22-23.)

48.   Ross employees placed the Chair along with five or six other Aztec Leather Iron Table Set chairs on the sales floor of the Preston Center store sometime prior to September 17, 2004. (Tr. Vol. 1 at 127.)

49.   Ross employees had a second opportunity to detect a defect or damage to the Chair when they moved it from the stockroom to the sales floor. (Tr. Vol. 1 at 152-53.)

50.   Damaged products are not placed on the sales floor at Ross. (Tr. Vol. 1 at 74, 78-79, 161.)

51.   Ross conducts regular safety training, safety meetings, and safety inspections of the store, including tracking damaged merchandise. (Tr. Vol. 1 at 102, 106-109, 122, 124; Tr. Vol 2 at 12-14, 19; Ross Ex. 5.)

52.   The aisles of the Ross store at Preston Center are regularly inspected by Ross employees. (Tr. Vol. 1 at 75, 126; Tr. Vol. 2 at 11.)

53.   Damaged merchandise is removed from the sales floor and placed in the stockroom as soon as it is noticed by Ross employees. (Tr. Vol. 1 at 174.)

54.   On May 27, 2004, Ross cited the Preston Center store for not properly conducting an inventory of damaged or broken merchandise on a daily basis as required by company policy. (Ross Ex. 21; Tr. Vol. 2 at 44-48.)

55.   A typical folding metal chair at Ross is on the sales floor for approximately three to ten days. (Tr. Vol. 1 at 128.)

56.   Once a month, Ross marks down the price of items that do not sell within a certain period of time, although occasionally some items are already marked down when they are first

placed on the sales floor.  (Tr. Vol. 1 at 129-30.)

57. Ross invites customers to sit in its chairs prior to purchasing them.  (Tr. Vol. 1 at 142.)

58. Ross does not maintain sample merchandise on its sales floor; customers purchase items from the sales floor.  (Tr. Vol. 1 at 82-83, 94.)

59. David Lowe and Jay Brewer, two of Ross's employees, testified that the longer a chair remains on the sales floor, the greater the likelihood that it will be abused by a customer, although no one saw the Chair being abused.  (Tr. Vol. 1 at 137-38, 163, 172.)

60. There have never been any reports of customer abuse to furniture in the Preston Center Ross store.  (Tr. Vol. 1 at 147, 163, 171.)

61. Sometime prior to September 17, 2004, the Chair was positioned with different chairs in the clearance aisle.  (Tr. Vol. 2 at 145-46.)

62. The Chair was marked "reduced" and on sale for $16.99.  (Ross Ex. 1.)

63. On September 17, 2004, Plaintiff Dorothy Hegwood was injured when she sat in the Chair at the Ross Preston Center store in Dallas, Texas.  (Tr. Vol. 1 at 112-17; Tr. Vol. 2 at 144-49).

64. At the time of the accident, the Chair was unfolded and upright on the sales floor.  (Tr. Vol. 2 at 146-47.)

65. Plaintiff Dorothy Hegwood weighed approximately 125 pounds at the time of the accident.  (*See* Ross Ex. 77.)

66. When Plaintiff Dorothy Hegwood sat on the Chair, it did not bear her weight and instead collapsed to the ground.  (Tr. Vol. 2 at 146-47.)

67. After the accident, Dr. Raymond Schiltz, a metallurgical expert, examined the Chair and tested an identical exemplar chair of the Aztec Leather Iron Table Set.  (Tr. Vol. 3 at 14; Heavy Metal Ex. 4.)

68. The right weld of the Chair, which has 180 degrees of welding material covering the top of the leg tube, is inferior to the left weld, which has 270 degrees of coverage.  (Ross Ex. 1; Tr. Vol. 3 at 11, 62-63.)

69. The right weld of the Chair failed.  (Ross Ex. 1.)

70. The crossbar of the Chair is bent in two places: in the middle and near the intact left weld.  (Ross Ex. 1; Tr. Vol. 3 at 12.)

- 8 -

71.     For the center bend in the crossbar to have occurred, both the right and left welds must have been intact because the bar cannot bend in the center if there is no support at each end. (Tr. Vol. 3 at 12, 24.)

72.     The center bend in the crossbar preceded the failure of the right weld. (Tr. Vol. 3 at 24, 74-75.)

73.     Dr. Schiltz testified that the exemplar chair supported 320 pounds in static weight testing before the crossbar started to bend and before the chair subsided. (Tr. Vol. 3 at 19, 23-24, 53-55.)

74.     An alternative design with two metal brackets closer to the welds on the leg tubes would have increased the load capacity of the Aztec Leather Iron Table Set chair. (Tr. Vol. 3 at 42-43.)

75.     Sometime after the Chair was placed on display on the sales floor but prior to when Plaintiff Dorothy Hegwood sat in the Chair, excessive weight was applied to the Chair which bent the crossbar. (Tr. Vol. 3 at 25-26.)

76.     The Chair had been damaged to the extent that it could support little or no weight beyond its own prior to when Plaintiff Dorothy Hegwood sat on it. (Tr. Vol. 3 at 23-26.)

77.     The collapse of the Chair ultimately was caused by the failure of the right weld which was essential to the structural integrity of the chair, but the right weld would not have failed but for the bent crossbar. (Heavy Metal Ex. 4; Tr. Vol. 3 at 24, 61, 74-75.)

78.     Prior to the accident, Ross had no complaints regarding products from Heavy Metal. (Tr. Vol. 1 at 22-23, 47-48, 185; Vol. 3 at 140.)

79.     Ross had no complaints about, and no failures were reported regarding any of the other 1199 identical Aztec Leather Iron Table Set chairs that were part of this order from Heavy Metal. (Tr. Vol. 3 at 140.)

## III.  CONCLUSIONS OF LAW

### A.  Choice-of-Law

The Court first considers whether California or Texas law is applicable.  Paragraph 24 of the agreement between the parties states that the "purchase order will be construed under California law." (Findings of Fact, ¶21.)  Despite this explicit choice-of-law provision, Ross contends that "[i]t is undisputed that Plaintiffs' products liability and negligence claims against Ross are governed by *Texas* law.  The key issue before the Court is whether the indemnity agreement interpreted under *California* law requires Heavy Metal to indemnify Ross for both Plaintiffs' products liability and negligence claims under Texas law."  (Ross Br. at 7) (emphasis added.)  Heavy Metal does not explicitly dispute that Texas law applies to Plaintiffs' claims products liability and negligence, but it applies both California and Texas law to its analysis of products liability and negligence.  (*See* Heavy Metal Br.; Heavy Metal Obj.)  Neither Ross nor Heavy Metal presented any evidence or argument that they modified the choice-of-law provision in the purchase order agreement.  Given Ross's citation to the law of both jurisdictions and Heavy Metal's application of the law of both jurisdictions, the Court finds no agreement to modify.  Moreover, although questions of products liability and negligence remain essential to the interpretation of the indemnity provision, the remaining dispute between Ross and Heavy Metal is exclusively contractual in nature.[3]  The purchase order provides indemnification for "any claim, arising in connection with the merchandise or in connection with this purchase order."  (Findings of Fact, ¶17.)  Since the interpretation of the

---

[3]Settlement with Plaintiffs removed diversity, but the settlement did not divest the Court of jurisdiction since jurisdiction in federal court based on diversity of citizenship, once established, is not affected by subsequent events such as the elimination of parties essential to the creation of diversity jurisdiction at the time the action was filed.  *See Freeport-McMoRan, Inc. v. K N Energy, Inc.*, 498 U.S. 426, 428 (1991); *See* Findings of Fact, ¶¶1, 2 (finding California as the principal place of business for both Ross and Heavy Metal).

purchase order's language of "any claim" encompasses products liability and negligence, the Court finds that California products liability and negligence law applies pursuant to the choice-of-law provision in the agreement.

Relevant case law also supports the application of California law to all claims raised by Ross and Heavy Metal. "A federal court considering a diversity case that implicates choice of law must determine which state's law applies by following the choice of law rules of the forum state." *Marchesani v. Pellerin-Milnor Corp.*, 269 F.3d 481, 485 (5th Cir. 2001) (citing *Erie v. Tompkins*, 304 U.S. 64 (1938)). Texas applies the "most significant relationship" test when evaluating choice-of-law issues in contractual disputes. *Minnesota Min. and Mfg. Co. v. Nishika Ltd.*, 953 S.W.2d 733, 735 (Tex. 1997). To that end, the Court may consider: (a) the place of contracting; (b) the place of negotiation; (c) the place of performance; (d) the location of the contract's subject matter; and (e) the parties' domicile, residence, nationality, place of incorporation, and place of business. *Id*. at 735-36. This case involves four jurisdictions (California, New York, Delaware, and Texas), (Findings of Fact, ¶¶1, 2, 6, 63), but four of the factors (a, b, c, and e) favor California and only one factor (d) favors Texas. Thus, California is the state with the "most significant relationship" to the contractual dispute between Ross and Heavy Metal, and California law applies to all claims, including those for products liability and negligence. *Minnesota Min.*, 953 S.W.2d at 735-36.

## B. The Purchase Order Agreement

Having determined that California law applies, the Court turns to the agreement between Ross and Heavy Metal for the purchase of the Chair. The indemnity provision of Paragraph 21 of the purchase order agreement states that Heavy Metal will "defend, indemnify, and hold [Ross] harmless...from any claim, arising in connection with the merchandise or in connection with the

purchase order." (Findings of Fact, ¶17.) Under California law, when parties have expressly contracted to assume a duty to indemnify, the extent of the duty is determined by the contract. CAL. CIV. CODE § 2772; *Rossmoor Sanitation, Inc. v. Pylon, Inc.*, 532 P.2d 97, 100 (Cal. 1975). Like any contract, an indemnity agreement must be construed so as to give effect to the mutual intent of the parties at the time of contracting. CAL. CIV. CODE § 1636; *Morton Thiokol, Inc. v. Metal Bldg. Alteration Co.*, 238 Cal.Rptr. 722, 725 n.2 (Cal.App. 1st Dist. 1987). The Court must therefore determine whether the language of the indemnity agreement requires Heavy Metal to indemnify and defend Ross for Plaintiffs' claims of defective design, defective manufacture, and negligence.[4]

### 1. Design and Manufacturing Defect

Ross contends that the Heavy Metal must tender indemnity and defense for the Chair's design and manufacturing defects; Heavy Metal asserts that the Chair was not defective and that it therefore is not required to indemnify or defend Ross for these claims.[5]

California recognizes two categories of product defects: design defects and manufacturing defects. *Barker v. Lull Eng'g Co.*, 573 P.2d 443. 454-55 (Cal. 1978). A design defect exists when the product is built in accordance with its intended specifications, but the design itself is inherently defective. *Id.* at 454. In *Barker*, the California Supreme Court recognized two tests for proving design defect. The "consumer expectation test" permits a plaintiff to prove design defect by demonstrating that "the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner." *Id.* This expectation reflects the

---

[4] Because Ross no longer asserts claims for statutory indemnity and contribution pursuant to TEX. CIV. PRAC. & REM. CODE. §§ 33.016 and 82.002 against Heavy Metal, the Court need not address these claims. (*See* Ross Obj. at 20.)

[5] The parties do not dispute that the indemnity provision covers design and manufacturing defects. (*See* Findings of Fact, ¶¶19, 20.)

representation that the product will safely do the job for which it was built. *Id.* (citing *Greenman v. Yuba Power Prods., Inc.*, 377 P.2d 897, 901 (Cal. 1963)). The second test for a design defect is known as the "risk-benefit test." Under this test, products that meet ordinary consumer expectations nevertheless may be defective if the design embodies an "excessive preventable danger." *Id.*

Ross contends that the Chair was defectively designed for two reasons. The first alleged design defect is that by welding the thin-walled tubing of the leg to the thicker solid crossbar, the heat required to form the bond weakened the leg tube. (Ross Findings of Fact, ¶68.) The second alleged design defect is that the sliding crossbar passed over the open end of the leg tubing. *Id.* According to Ross, these two defects compromised the structural integrity and weight-bearing capacity of the Chair. However, neither of the alleged defects satisfy either of California's tests for proving a design defect. Under the consumer expectation test, Ross would need to produce evidence that the Chair failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner. *Barker*, 573 P.2d at 452. Ross produced no such evidence at trial, and the evidence introduced shows that the chairs of the Aztec Leather Iron Table Set, including the Chair, were designed and tested to withstand a 300 pound static weight test.[6] (Findings of Fact, ¶¶33, 35.) Ross did not request any specific weight test or weight-bearing capacity for the Aztec Leather Iron Table Set chairs even though it could have at the time it placed the order. (*Id.* at ¶12.) Since, according to testimony, quality issues are normally detected in the first 5 to 10% of a sample, and Permaisuri tested 30% of the order containing the Chair, any defect in the design's weight-bearing capacity would have been identified during Permaisuri's inspection

---

[6]Ross asserts in its brief that the exemplar chair failed at some point between 280 and 320 pounds. (Ross Br. at 10.) This assertion misstates the testimony of Heavy Metal's metallurgical expert who stated that he detected no permanent damage at 280 pounds and that the exemplar chair supported 320 pounds before gently subsiding. (Tr. Vol. 3 at 53-55; Findings of Fact, ¶73.)

process. (*Id*. at ¶¶28, 31.) The order containing the Chair passed Permaisuri's inspection, so the design of the Chair therefore performed safely as an ordinary consumer would expect when used to support Plaintiff Dorothy Hegwood's 125-pound body. (*See Id*. at ¶¶35, 65.) In further support of the Chair design's weight-bearing capacity, the exemplar chair exceeded the designed weight-bearing capacity by 20 pounds when tested by Heavy Metal's metallurgical expert. (*Id*. at ¶73.) Furthermore, Ross did not present any evidence of any failures regarding the other 1199 ostensibly identical Aztec Leather Iron Table Set chairs it ordered from Heavy Metal. (*Id*. at ¶79.) Thus, Ross has not met its burden to show that the design of Chair did not meet consumer expectations. *Barker*, 573 P.2d at 454.

The Chair also met California's "risk-benefit test" for a design defect. To find that the design of the Aztec Leather Iron Table Set chair posed an "excessive preventable danger," the trier of fact must find that the risk of danger inherent in the challenged design outweighs the benefits of such design. *Id*. In evaluating the adequacy of a product's design under the risk-benefit test, the trier of fact

> may consider, among other relevant factors, the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design.

*Id*. at 455. Although an alternative design with two metal brackets closer to the welds on the leg tubes would have increased the load capacity of the Aztec Leather Iron Table Set chair, (Findings of Fact, ¶74), Ross introduced no evidence to show that the two-bracket design was financially or mechanically feasible or that the danger of collapse of the Chair as designed presented an excessive preventable danger. Thus, Ross has not met its burden to show that the Chair failed the risk-benefit

test for a design defect. *Barker*, 573 P.2d at 454.

Ross also contends that the right weld of the Chair constituted a manufacturing defect.[7] Under California law, a manufacturing defect exists when an item is produced in a substandard condition. *Id.* Such a defect is often demonstrated by showing the product performed differently from other ostensibly identical units of the same product line. *Id.* In the instant case, the right weld, with 180 degrees of welding material covering the top of the leg tube, was inferior to the left weld, which had 270 degrees of coverage. (Findings of Fact, ¶68.) Ross accords great weight to the failure of the right weld. However, the crossbar was bent in the center; because the bar could not bend in the middle if there is no support at each end, both the right and left welds must have been intact at the time the bar bent. (*Id.* at ¶71.) Therefore, excessive weight must have been applied to the Chair *prior to* the failure of the right weld. (*Id.* at ¶¶75, 76.) Although the collapse of the Chair ultimately was caused by the failure of the right weld, the right weld would not have failed but for the bent crossbar. (*Id.* at ¶77.) Thus, it was the bent crossbar rather than the right weld which made the Chair incapable of supporting Plaintiff's weight. Furthermore, the evidence introduced at trial fails to show a manufacturing defect as defined by California law. Although there is a clear difference in the degree of coverage of welding material in the right and left welds, this difference does not amount to a manufacturing defect because Ross has not shown that the 180-degree right weld was substandard to the manufacturing specifications. *See Barker*, 573 P.2d at 454. The only

---

[7]Ross alleges a second manufacturing defect in that the heat required to bond the hollow leg tube to the solid crossbar weakened the leg. (Ross Findings of Fact, ¶69.) The placement of the weld addresses product design, not manufacture, and Ross has not shown that the weld placement or that welding a hollow leg tube to a solid crossbar constituted a design defect under either the consumer expectation test or the risk-benefit test. *See Barker*, 573 P.2d at 454-55. If Ross intended to say that the heat used to bond the Chair's solid crossbar to the hollow leg tube or that the placement of the weld on the Chair were not in accordance with manufacturing specifications, Ross has not shown what the manufacturing specifications were for the welds of the Aztec Leather Iron Table Set chairs. Ross therefore has not shown a manufacturing defect for the heat used to create the Chair's right weld. *See id.*

basis of comparison for the right weld introduced by Ross was the Chair's left weld; Ross did not

introduce any evidence to show that the 180-degree right weld deviated from the design's specified

amount of welding material. With only one weld to serve as a comparison, it is equally possible that

the 270-degree left weld deviated from the standard 180 degrees.

For the reasons stated above, the Court finds that Ross has not met its burden to show by a

preponderance of the evidence that the Chair was defectively designed or manufactured. Ross is

therefore not entitled to indemnity for these claims.[8]

### 2. Negligence

The Court turns to the issue of whether Paragraph 21 of the purchase order agreement

requires indemnity from Heavy Metal for Plaintiffs' claims of negligence against Ross.[9] The Court

addressed many of the same legal and factual issues when it denied Ross's July 21, 2006 motion for

partial summary judgment on the grounds that genuine issues of material fact remained prior to trial.

*See Hegwood v. Ross Stores, Inc.*, 2006 WL 3422221 (N.D. Tex. Nov. 28, 2006) (Ramirez, J.)

Pursuant to California law, Ross is entitled to indemnity from Heavy Metal if negligence is

---

[8]The Court notes that even if it applied Texas products liability law, the end result would be the same. Ross has not shown that the Chair was unreasonably dangerous as designed (design defect) or that the Chair deviated from the specifications in a manner that rendered the Chair unreasonably dangerous (manufacturing defect). *See Hernandez v. Tokai Corp.*, 2 S.W.3d 251, 257 (Tex. 1998) (stating that in order to prove a design defect, a claimant must show that the product was defectively designed so as to be unreasonably dangerous, taking into consideration the utility of the product and the risk involved in its use); TEX. CIV. PRAC. & REM. CODE ANN. § 82.005(a) (Vernon 1997) (a design defect exists only if a safer alternative design is reasonably available); *American Tobacco Co., Inc. v. Grinnell*, 951 S.W.2d 420, 434 (Tex. 1997) (stating that a manufacturing defect exists when "a finished product deviates, in terms of construction or quality, from the specifications or planned output in a manner that renders it unreasonably dangerous.")

[9]The parties do not dispute that the indemnity provision encompasses Plaintiffs' claims of negligence against Heavy Metal for failure to inspect the Chair and the manufacturing facilities in China. However, neither party addressed these claims in their briefs to the Court. (*See* Ross Br.; *see* Heavy Metal Br.) Furthermore, Ross did not prove by a preponderance of evidence that Heavy Metal was negligent in its inspection of the Chair or manufacturing facility. Heavy Metal, through its China-based agent Permaisuri, inspected and performed quality control checks at Fuzhou Mei Juan on the order that included the Chair. (Findings of Fact, ¶28.) The evidence at trial also showed that the order which included the Chair passed inspection. (*Id*. at ¶35.)

a matter "embraced by the indemnity." CAL. CIV. CODE § 2778(4). On its face, the expansive language of Paragraph 21 providing indemnity for "any claim arising in connection with the merchandise" would seem to include Plaintiffs' claims of negligence against Ross. (*See* Findings of Fact, ¶17.) However, the seminal California case addressing the indemnification of negligence holds that when parties seek to indemnify an indemnitee against its own negligence, "the agreement for indemnification must be clear and explicit." *Goldman v. Ecco-Phoenix Elec. Corp.*, 396 P.2d 377, 379 (Cal. 1964). Any such agreement must be strictly construed against the indemnitee. *Id.* The indemnity provision in the purchase order between Ross and Heavy Metal is silent on the issue of negligence; an uncertainty therefore exists as to whether the parties agreed to indemnify an indemnitee against its own negligence. (Findings of Fact, ¶18.) In cases of uncertainty, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist. CAL. CIV. CODE § 1654. In this dispute, Ross drafted the terms and conditions of the purchase order agreement and therefore caused the uncertainty regarding negligence to exist. (Findings of Fact, ¶14.) Because Paragraph 21 does not mention negligence at all (*id.* at ¶18), it fails the requirement of a clear and explicit agreement to defend and indemnify an indemnitee against its own negligence. Strictly construing the agreement against Ross, the indemnitee and drafter of the purchase order agreement, negligence is not a matter embraced by the indemnity. *See Goldman*, 396 P.2d at 379.

Although a strict construction shows that the purchase order agreement does not indemnify for negligence, pursuant to California law, the absence of specific language does not mean that negligence is never indemnified. If an indemnity clause is silent on an indemnitee's negligence, as

it is in the present case, it is referred to as a "general" indemnity clause.[10] *Gonzales v. R. J. Novick Constr. Co.*, 575 P.2d 1190, 1197-98 (Cal. 1978). The leading case on the interpretation of general indemnity provisions holds that whether an indemnity agreement encompasses negligence "turns primarily on contractual interpretation, and it is the intent of the parties as expressed in the agreement that should control...This requires an inquiry into the circumstances of the damage or injury and the language of the contract; of necessity, each case will turn on its own facts." *Rossmoor*, 532 P.2d at 104; *McCrary Constr. Co. v. Metal Deck Specialists, Inc.*, 35 Cal.Rptr.3d 624, 631 (Cal.App. 1st Dist., 2005) (ascertaining the intent of an indemnity clause requires an inquiry into the circumstances of each case); *Heppler v. J.M. Peters Co.*, 87 Cal.Rptr.2d 497, 508 (Cal.App. 4th Dist., 1999) (emphasizing contractual interpretation in determining whether negligence is covered by an indemnity agreement); *see Hegwood*, 2006 WL 3422221, at *3 n.2 (stating that *Rossmoor* favors an approach that relies on contractual interpretation). As discussed in the previous paragraph, the language of Paragraph 21 does not indemnify for negligence under a strict interpretation of the contract because it lacks clear and specific language as required by *Goldman*. 396 P.2d at 379. However, the Court may also examine the general indemnity clause under *Rossmoor*, which requires an inquiry into the intent of the parties and the circumstances of the damage or injury. 532 P.2d at 104.

To determine the intent of the parties, a court is to construe an indemnity provision of a contract under the same rules governing other contracts. *Gribaldo v. Agrippina Versicherunges A.G., et al.*, 476 P.2d 406, 410 (Cal. 1970). California law requires that a contract be interpreted to give effect to the mutual intention of the parties as it existed at the time of contracting, so long as

---

[10]General indemnity provisions are sometimes referred to as "Type II" indemnity provisions. *MacDonald & Kruse, Inc. v. San Jose Steel Co.*, 105 Cal. Rptr. 725, 728-29 (Cal. App. 2nd Dist. 1972).

the intent is ascertainable and lawful.  CAL. CIV. CODE § 1636.  Such intent is to be inferred, if possible, solely from the written provisions of the contract.  *Id*. at § 1639.  Since the indemnity clause is silent on the issue of negligence, the Court turns to extrinsic evidence to ascertain the intent of Ross and Heavy Metal at the time they entered into the purchase order agreement.  *See id*. at § 1860 (proper construction of an instrument may consider the circumstances under which it was made).  At trial, the corporate representatives of Heavy Metal and Ross both testified that the indemnity provision was not intended to cover any damage caused by Ross or Ross's customers.  (Findings of Fact, ¶19, 20.)  Heavy Metal only agreed to "stand behind" its products, which both parties understood to be an indemnification for products liability and negligence by Heavy Metal.  *Id*.  Based on the mutual intent of the parties at the time they entered into the agreement, the indemnity provision does not encompass claims of negligence by Ross.

The circumstances of the damage to the Chair and Plaintiffs' resulting injuries also support this finding.  Once the shipping box containing the Chair arrived at Ross's distribution center in Newark, California, in early February 2004, the Chair was in Ross's exclusive possession.  (*Id*. at ¶37.)  Sometime between March and September 2004,[11] the shipment containing the Chair arrived

---

[11]Ross contends that it placed the Chair on the sales floor at Preston Center sometime between September 7 and September 14, 2004.  (Ross Br. at 3-4.)  This assertion is based on testimony by a Ross employee that folding metal chairs typically sell within three to ten days from the date they are placed on the floor and the fact that Plaintiff Dorothy Hegwood injured herself on September 17, 2004.  (*See* Findings of Fact, ¶¶55, 63.)  However, Ross's inference is not supported and is even contradicted by evidence in the record.  Neither Ross nor Heavy Metal introduced evidence of when the shipment containing the Chair from Ross's distribution facility in Newark, California, arrived at the Preston Center store in Dallas.  The evidence shows that Ross's Newark distribution center completed processing the order containing the Chair on February 27, 2004.  (*Id*. at ¶38.)  The next known date involving the Chair is when Plaintiff Dorothy Hegwood sat on the Chair on September 17, 2004.  (*Id*. at ¶63.)  Thus, the Chair could have been placed on the sales floor at Preston Center anytime between early March 2004 and September 17, 2004 (*See id*. at ¶¶38, 49.)

Additional evidence indicates that the Chair spent more than three to ten days on the sales floor.  Once a month, Ross marks down merchandise that has not sold within a specified period of time.  (*Id*. at ¶56.)  The Chair, which had an initial price of $24.99, was marked "reduced" and on sale for $16.99 at the time Plaintiff Dorothy Hegwood sat on it.  (*Id*. at ¶¶39, 62.)  While items occasionally are marked "reduced" at the time they are placed on the sales floor, (*id*. at ¶56), the Chair was the last of its kind even though five or six other Aztec Leather Iron Table

- 19 -

at Ross's Preston Center store whereupon Ross employees unpacked the shipment in the stockroom. (*Id*. at ¶41.) While unpacking the shipment, Ross employees lifted each Aztec Leather Iron Table Set chair out of the box with the underside of the seat facing them. (*Id*. at ¶42.) Ross employees then unfolded each chair and applied pressure to the seats while the chairs were on the floor to ensure that each chair unfolded and locked into place properly. (*Id*. at ¶43.) Ross introduced no evidence to show that the crossbar was bent before its employees unpacked the Chair in the Preston Center stockroom; if the crossbar was bent, the Chair would not have been placed on the sales floor. (*Id*. at ¶¶46, 47.) Moreover, if the crossbar were bent prior to the Chair's arrival at Preston Center either through Permaisuri's testing process or during shipment from China, Ross employees would have noticed due to nature of the unpacking process. (*Id*. at ¶¶45, 46.)

After unpacking the Chair in the stockroom, Ross employees placed the Chair on the sales floor where it spent between three days and six and half months. (*See id*. at ¶¶38, 49.) During the time in which the Chair was on the sales floor, customers had the opportunity to sit in the Chair prior to purchase. (*Id*. at ¶57.) Two Ross employees testified that with the passage of time, the likelihood of customer abuse increases. (*Id*. at ¶59.) Although there have never been any reports of customer abuse to furniture at the Preston Center store, a metallurgical analysis of the Chair showed that excessive weight was applied to the Chair and bent the metal crossbar sometime before Plaintiff Dorothy Hegwood sat in it. (*Id*. at ¶¶60, 75.) Due to the lack of evidence that the crossbar was damaged prior to when Ross took possession of the Chair, the nature of the unpacking process, and the metallurgical analysis of the Chair, the Court concludes that the Chair was damaged to the extent

---

Set chairs were placed on the sales floor along with the Chair shortly after the shipment arrived from Newark, California. (*Id*. at ¶¶49, 61.) Finally, Plaintiff Dorothy Hegwood found the Chair in the clearance aisle, (*id*. at ¶61), which indicates that it was on the sales floor for more than three to ten days.

that it was unable to support Plaintiff Dorothy Hegwood's weight sometime while in the exclusive

possession of Ross. (*Id*. at ¶76.) The circumstances of the damage to the Chair's crossbar therefore

indicate that the general indemnity provision in the purchase order agreement does not indemnify

Ross for its own negligence. *Rossmoor*, 532 P.2d at 104.

When the Court considers the lack of clear and explicit language addressing negligence in

the indemnity provision, the intent of the parties at the time they entered into the agreement, and the

circumstances of the damage to the Chair and Plaintiffs' resulting injuries, the Court finds that

negligence is not a matter embraced by the purchase order agreement's indemnity under California

law.[12]  *Id*.  The parties neither intended nor agreed that Heavy Metal would indemnify Ross for

anything outside of Heavy Metal's control, and the circumstances of the case indicate that the

structural integrity of the Chair was compromised while the Chair was in the exclusive possession

of Ross.  Heavy Metal did not agree, nor does California law require, indemnification for such a

situation.

---

[12]Ross, and to a lesser extent Heavy Metal, places a heavy emphasis on the distinction between active and passive negligence as defined in California law. (*See* Ross Br. at 13-18; Heavy Metal Br. at 15-22.) This emphasis is misplaced since the seminal case on the interpretation of general indemnity provisions stated that the active-passive dichotomy is not "wholly dispositive" of any case. *Rossmoor*, 532 P.2d at 103. The *Rossmoor* court held that whether an indemnity agreement encompasses negligence "turns primarily on contractual interpretation, and it is the intent of the parties as expressed in the agreement that should control." *Id*. at 104. Thus, the distinction between active and passive negligence is a *guide* to the interpretation of a general indemnity provision, not a rigid test that must be applied in every case. *See id*. Other California cases reflect the pragmatic approach of *Rossmoor*. *See, e.g. McCrary*, 35 Cal.Rptr.3d at 631-32 (stating that the active-passive distinction is not wholly dispositive but is a guide to interpretation); *Maryland Cas. Co. v. Bailey & Sons, Inc.*, 41 Cal.Rptr.2d 519, 527 (Cal.App.4th Dist. 1995) (stating that the general rule of active and passive negligence may not always apply and is merely a tool to be used to ascertain the intent of the parties.)

The Court finds that (1) the lack of a clear and explicit agreement regarding negligence, (2) the evidence submitted at trial concerning the intent of the parties, and (3) the circumstances leading up to Plaintiffs' injuries are sufficient for the Court to interpret the indemnity provision and conclude that the purchase order agreement did not indemnify Ross for its own negligence. The Court therefore need not consider whether Ross was actively or passively negligent. Finally, the Court notes a finding of passive negligence *permits*, not obligates, recovery by an indemnitee under a general indemnity provision. *Gonzales*, 575 P.2d at 1198 (citations omitted).

### 3. Duty to Defend

Paragraph 21 of the purchase order agreement contains a provision requiring Heavy Metal to defend Ross for claims arising from the Chair. (Findings of Fact, ¶17.) For indemnitors, the "duty to defend is not triggered until it is determined that the proceeding against the indemnitee is 'embraced by the indemnity.'" *Heppler*, 87 Cal.Rptr.2d at 512. Since the Court has determined that Plaintiffs' claims are not matters embraced by the indemnity, the duty to defend has not accrued. Heavy Metal therefore owed no duty to defend Ross at any point in this litigation.[13]

## IV. CONCLUSION

For the reasons stated above, the Court finds that Ross failed to prove by a preponderance of evidence that the Chair was defectively designed or manufactured. Ross also failed to prove by a preponderance of evidence that Paragraph 21 of the purchase order agreement requires indemnity from Heavy Metal for Plaintiffs' claims of negligence against Ross. The Court therefore finds for Heavy Metal on Ross's claims for indemnity and defense.

**SO ORDERED** on this 28th day of July, 2007.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[13]Since Heavy Metal is the prevailing party, the Court need not consider its arguments for apportionment and contribution.